**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**JAIME LOREE ARMIJO, on behalf of
herself and all others similarly situated,**

          Plaintiff,

v.                                 **No: 1:17-cv-00440-RB-KK**

**FEDEX GROUND PACKAGE SYSTEM, INC.,
a foreign company,**

          Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Are FedEx drivers employees or independent contractors? Variations of this employment dispute have played out in cases across the nation, including several multi-state class action lawsuits, but the question has never been addressed under New Mexico law. Plaintiff Jaime Loree Armijo[1] worked as a pick-up and delivery driver for FedEx Ground Package System, Inc. (FedEx) for several years. She alleges that she was a FedEx employee during that time and is entitled to overtime payments under the New Mexico Minimum Wage Act (MWA) for the long hours she was required to work in order to fully service her route. FedEx argues that Ms. Armijo was paid per package and per stop on her route, not by the hour, and thus is not an "employee" as a matter of law because this compensation method falls under the MWA's "piecework" exception.

**I.      Factual and Procedural Background[2]**

FedEx is a "federally-registered motor carrier that offers the pickup and delivery of packages to businesses and residences." (Doc. 102-1 at 5[3] ¶ 1; *see also* Doc. 76-1 ¶ 18.) Since

---

[1] Plaintiff is now known as Jaime Loree Brown (*see* Doc. 104-1 ¶ 1), but the Court refers to her in this Memorandum Opinion and Order using her former surname, Armijo, as the parties do in their briefing.

[2] The Court recites all admissible facts in a light most favorable to the party opposing summary judgment, Ms. Armijo. *See* Fed. R. Civ. P. 56. Unless otherwise noted, the parties' statements of fact that the Court cites herein are undisputed.

[3] Where internal pagination differs from the CM/ECF page numbers, the Court's citations are to CM/ECF.

2011, FedEx has only contracted in New Mexico with incorporated businesses, not individual drivers. (*See* Docs. 102-1 at 5 ¶ 2; 76-1 ¶¶ 7–8.) FedEx terms such entities "Contracted Service Providers" (CSPs), and CSPs enter into Operating Agreements (OAs) with FedEx. (*See* Docs. 102-1 at 5 ¶¶ 2–4; 76-1 ¶¶ 5, 7.) Pursuant to the OAs, all individuals who drive for a CSP are required to be employees of that CSP. (Doc. 102-1 at 5 ¶ 4; 76-1 ¶ 12.)

In July 2013, Ms. Armijo executed a "Pick-Up and Delivery Contractor Operating Agreement" with FedEx on behalf of the CSP Jaimes Elegant P&D Corporation (Jaimes Elegant). (Doc. 102-1 at 5–6 ¶ 5.)  Ms. Armijo was the President and sole owner of Jaimes Elegant. (*See* Docs. 76-10 at 3; 102-2 at 109:1–7.) The contract provided that Jaimes Elegant would service a single route, or "Primary Service Area," by picking up and delivering all packages in the service area each day in exchange for weekly settlement payments. (*See* Docs. 102-1 at 5–6 ¶ 5, 6 ¶ 9; 102-2 at 185:8–12, 187:17–25.) The contract period lasted approximately three years, and during that time Ms. Armijo hired a total of five other employees, with varying lengths of employment, to drive the route for Jaimes Elegant. (*See* Docs. 102-1 at 6 ¶ 7; 102-2 at 252:20–256:2.) For about the first seven months of the contract, Ms. Armijo alone drove and serviced the route. (*See* Docs. 102-1 at 5–6 ¶ 5; 102-2 at 252:22–253:2.) For approximately the final year of the contract, Ms. Armijo delivered packages along the route "at a reduced level of involvement." (Doc. 102-1 at 6 ¶ 8; *see also* 102-2 at 253:10–17.)

Jaimes Elegant's OA allowed the company "full discretion . . . to compensate [its] own employees, such as individual drivers, as [it saw] fit, including hourly, daily, weekly, or as otherwise permitted by law." (Doc. 102-1 at 7 ¶ 12; *see also* Docs. 62-1 at 10; 76-1 ¶¶ 35–36.) Addendum 3 to the OA governs the specifics of how FedEx paid weekly compensation settlements to Jaimes Elegant. (*See* Docs. 102-1 at 6 ¶ 9; 63-1 at 3–32; 104 at 3 ¶ 1.) According to FedEx,

"CSP compensation is designed to account for all the activities and services they provide to FedEx Ground, including the loading of the CSPs' vehicles in the mornings and . . . the return of packages picked up to the Ground station in time to be loaded onto a linehaul truck for onward delivery to FedEx Ground hubs." (Doc. 102-1 at 7 ¶ 13; *see also* Docs. 104 at 6; 76-3 ¶¶ 17–18; 102-3 at 187:25–188:25.) Per the OA, Jaimes Elegant's settlements included payments based on: the numbers of stops and packages picked up and delivered (*see* Doc. 63-1 at 3–4); the number of miles driven (if more than 200 in a given day) (*see id.* at 4–5); fuel settlements based on fuel price changes in the service area (*see id.* at 5–6); a weekly "core zone" subsidy providing an additional stipend based on the number of stops made and the customer density of the route (*see id.* at 14–18); mileage and fuel settlements for longer distance "linehaul" work (*see id.* at 22–27); and weekly "flex program" payments, which included a base weekly payment for participation in the program and a per-package payment for any "flexed" packages that drivers picked up or delivered outside Jaimes Elegant's service area (*see id.* at 31). (*See also* Docs. 102-1 at 6 ¶ 10, 8 ¶ 18; 104 at 5 ¶ 2; 102-2 at 247:3–248:11.)

The parties agree that there were four "distinct additional employment requirements imposed by FedEx" in addition to the general requirement that Jaimes Elegant complete all the required package pickups and deliveries each day.[4] (*See* Docs. 104 at 3–4 ¶ 3; 106 at 5–6.) These requirements included: (i) mandatory quarterly groups meetings with the FedEx terminal manager and other FedEx personnel to discuss safety and terminal performance (*see* Docs. 104 at 3–4 ¶¶ 3–

_____

[4] These additional duties are enumerated as material facts in Ms. Armijo's Response brief. (*See* Doc. 104 at 3–5.) In its Reply, FedEx does not dispute the facts themselves, but asserts that the duties are part of drivers' pickup and delivery responsibilities and thus accounted for in the OA's compensation scheme. (*See* Doc. 106 at 5–7.) FedEx argues that Ms. Armijo's statement of these facts does not "create[] or expose[] any question of fact that would preclude summary judgment." (*Id.* at 7.) The Court thus recites the existence of these affirmative duties as undisputed facts and will address their relevance in the analysis section below.

4; 104-1 at 1–2; 81-2 at 410:1–23); (ii) mandatory waiting time at the FedEx terminal prior to departure, during which fully loaded vehicles were prohibited from departing the terminal until all other vehicles had been loaded and all packages were accounted for (*see* Docs. 104 at 3 ¶ 3; 81-2 at 166:11–22; 67-1 at 218:2–8; 104-1 at 2); (iii) designated windows of time in which certain deliveries or pickups must be made[5] (Docs. 104 at 3–5 ¶¶ 3, 6; 104-1 at 2–3; 104-3 at 160:17–161:18); and (iv) the completion of various administrative tasks upon returning to the FedEx terminal at the end of the day (Docs. 104 at 3–4 ¶ 3, 5 ¶ 7; 81-2 at 343:13–25.)

"Drivers were generally required to arrive at the FedEx terminals by" 7:00 a.m. and were not allowed to depart the terminal until all packages had been sorted and accounted for and all the trucks were completely loaded. (Doc. 104 at 4 ¶ 5; *see also* Doc. 104-1 at 2.) "On average, drivers had to wait 30 minutes every day between the time their trucks were loaded and the time they could depart the terminal and start their work." (Doc. 104 at 4 ¶ 5; *see also* Doc. 104-1 at 2.) After drivers returned to the terminal at the end of the day they "were required to complete various FedEx forms and perform other ministerial and administrative tasks[,]" including vehicle maintenance and inspections. (Docs. 104 at 5 ¶ 7; 104-1 at 3.) Ms. Armijo estimates that she spent an average of 2.5 hours per week on these post-delivery activities. (Doc. 104-1 at 3.)

The parties agree that Ms. Armijo was required to fulfill these duties even though they were not specifically listed in the OA, but disagree as to whether the activities were compensated. (*Compare* Doc. 104 at 3 ¶ 2 ("these are requirements whose violations FedEx considers a breach of the Operating Agreement, [yet] there is no mechanism for paying the drivers for satisfying these obligations"), *with* Doc. 106 at 5–6 (these requirements "are affirmative duties 'integral to the

---

[5] Ms. Armijo testified during her deposition, however, that she had worked with at least one customer to manage the pick-up and delivery windows to avoid unnecessary stops or wait times. (Docs. 102-1 at 7 ¶ 14; 102-2 at 186:17–187:16.)

delivery and pick-up process itself" and Plaintiff and other CSPs were compensated for these tasks under the express terms of the Operating Agreement") (quoting *Casias v. Distrib. Mgmt. Corp., Inc.*, No. CV 11-00874 MV/RHS, 2013 WL 12091857, at *8 (D.N.M. Mar. 27, 2013)).)

Ms. Armijo filed suit against FedEx on April 11, 2017, asserting that she and a putative class of similarly situated FedEx drivers had been misclassified as independent contractors when they were actually FedEx employees. (*See* Doc. 1 (Compl.) at 1–2.) Ms. Armijo asserted claims for recovery under New Mexico's unauthorized deduction statute, N.M. Stat. Ann. § 14-13-11(A), the New Mexico Minimum Wage Act, N.M. Stat. Ann § 50-4-22, and a theory of unjust enrichment. (*Id.* at 15–18.) On January 3, 2018, the Court dismissed Ms. Armijo's claims for violation of the unauthorized deduction statute and unjust enrichment, leaving only her overtime claim under the MWA. (*See* Doc. 42.)

In her Renewed Motion for Class Certification, Ms. Armijo urges the Court to certify a putative class of individuals who were signatories for entities that contracted with FedEx, like Jaimes Elegant, and also drove full time for FedEx. (*See* Doc. 87.) After Ms. Armijo first moved for class certification in March 2018 (Doc. 60), the Court denied her motion on the ground that the putative class was not ascertainable because Ms. Armijo failed to define what would make a driver "full-time." (*See* Doc. 86 at 6.) On October 19, 2018, Ms. Armijo filed a revised motion to certify her proposed class, this time defining the putative class as:

> All persons who (1) were signatories and authorized officers (2) on behalf of an entity (3) that contracted with either FedEx Ground System, Inc., or FedEx Home Delivery, Inc., to provide delivery services (4) and whose contract (known by the FedEx entities as the "IC" contract) classified the contracting entities as independent contractors (5) and who drove at least 32 hours a week (6) for at least 20 weeks within a given year [7] from April 11, 2014 forward.

(Doc. 87 at 1.) FedEx opposes Ms. Armijo's Renewed Motion for Class Certification, arguing that whether authorized signatories who were also drivers, like Ms. Armijo, were employees under

New Mexico's "economic realities test" cannot be determined by common evidence because "the misclassification inquiry is individualized for each" putative class member. (Doc. 91 at 32 (capitalization altered).)

With the motion for class certification still pending, on January 21, 2019, FedEx moved for summary judgment on Ms. Armijo's remaining claim under the MWA. (*See* Docs. 102; 102-1). FedEx argues that *even if* Ms. Armijo could prove that she should otherwise be classified as an employee under the economic realities test, her overtime claim would be precluded because Ms. Armijo is squarely excluded from the MWA's protections by an exception for employees who are compensated on a piecework basis. (*See* Doc. 102-1 at 10 (discussing N.M. Stat. Ann. § 50-4-21(C)(5)).) The Court will first take up FedEx's motion for summary judgment to determine if any issues remain for trial that would necessitate ruling on Ms. Armijo's motion for class certification.

## II.    Motion for Summary Judgment

Summary judgment is appropriate when the Court, viewing the record in the light most favorable to the nonmoving party, determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. The moving party bears the initial responsibility of showing "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted).

All the facts that are material to the question of whether Ms. Armijo was compensated on a piecework basis are undisputed. The parties have asserted various disputes as to questions of law and the relevance of various facts (*see* Docs. 104 at 3–6; 106 at 5–7), but the only genuine dispute of fact is whether Ms. Armijo was compensated for the affirmative duties FedEx required of her in addition to picking up and delivering packages. (*See* Docs. 104 at 3 ¶ 2; 106 at 5–6.) However, as will be explained further below, even viewing this disputed fact in a light most favorable to Ms. Armijo and assuming that she was *not* compensated for her waiting time and other affirmative duties, this fact is not material to the determination of whether she was paid on a piecework basis.

There are two dispositive legal questions before the Court: (1) whether FedEx paid Jaimes Elegant on a "piecework" basis, thus bringing Jaimes Elegant and Ms. Armijo[6] under the piecework exception to the MWA; and, if so, (2) whether the unproductive waiting time and other affirmative duties FedEx required of Ms. Armijo sufficiently alter the piecework structure such that the exception no longer applies. Having considered the parties' motions, the record, and relevant law, the Court answers the first question in the affirmative and the second in the negative and will grant FedEx's motion for summary judgment.

## A. FedEx paid Ms. Armijo on a "piecework" basis.

New Mexico's Minimum Wage Act "generally requires employers to pay overtime to employees who work more than 40 hours per week." *Casias*, 2013 WL 12091857, at *5 (citing

---

[6] FedEx contends that Ms. Armijo's claim is "premised on an incorrect and unexplained 'reverse piercing of the corporate veil' theory that any owner of a CSP . . . that drove the CSP's routes be treated as if the corporation that employed individual drivers did not exist." (Doc. 102-1 at 9 n.4.) As FedEx does not fully brief this issue, however, the Court will follow FedEx's lead and "assume for purposes of this motion . . . that Plaintiff will be successful on such theory . . . ." The Court will thus refer to FedEx compensating Ms. Armijo, though the settlement payments were made to Jaimes Elegant. (*See id.*)

N.M. Stat. Ann. § 50-4-22(D)). However, the MWA explicitly excludes "salespersons or employees compensated upon piecework, flat rate schedules or commission basis . . ." from its definition of "employees" covered by the Act. *See* N.M. Stat. Ann. § 50-4-21(C)(5). FedEx argues that its weekly settlement system, which compensates CSPs per stop, package, and mile, falls under the piecework exception as interpreted by courts in this District, and thus Ms. Armijo's overtime claim fails as a matter of law. (*See* Doc. 102-1 at 10–15.) Ms. Armijo argues for a narrower interpretation of the term "piecework," asserting that the compensation system established by her OA does not qualify as piecework and, even if it did, is removed from that definition by the additional requirements FedEx imposes on CSPs. (*See* Doc. 104 at 1–2.)

FedEx bears the burden of proving that Ms. Armijo is exempt from the MWA, *see Rivera v. McCoy Corp.*, 240 F. Supp. 3d 1150, 1155 (D.N.M. 2017) (citations omitted), and "[e]xemptions from the [MWA] are strictly and narrowly construed against employers." *Casias*, 2013 WL 12091857, at *5 (citing *New Mexico ex rel. State Labor Comm'r v. Goodwill Indus.*, 478 P.2d 543, 545 (N.M. 1970)). "Thus, an employer asserting an exemption defense must prove that the exemption 'unmistakably' includes the employee whom the employer claims to be exempt from the Act." *Id.* The MWA does not define the terms "piecework," "flat rate," or "commission," nor has the New Mexico Supreme Court addressed what types of payment systems fall under these exempted categories. *See id.* Several courts in this District, however, have examined similar issues in applying New Mexico law and reached instructive conclusions.

In *Olivo v. Crawford Chevrolet, Inc. (Olivo I)*, the plaintiffs were employed by a car dealership to paint and repair damaged automobiles. 799 F. Supp. 2d 1237, 1239 (D.N.M. 2011). "Plaintiffs were paid by the job[,] . . . mean[ing] that employees were given certain assignments and were paid a set amount per assignment—regardless of the amount of time it actually took to

complete the assignment." *Id.* at 1239–40. They were also, however, "each made to wait approximately 10–15 hours each week, without pay, at the body shop between work assignments." *Id.* at 1240. The plaintiffs asserted that they were thus "not truly paid on a flat rate or piecework basis" because "the fact that Defendants compelled Plaintiffs to remain on the premises at least some of the occasions when no assignments were available change[d] the analysis." *Id.* at 1242. The Defendants did "not deny that Plaintiffs were required to wait at the body shop between assignments, but [argued] that Plaintiffs' pay for completed assignments was understood by all to compensate for waiting time as well." *Id.* at 1240.

In *Olivo I*, United States District Judge Bruce Black found as a threshold matter that "[a]ll parties agree[d] that Plaintiffs earned a predetermined wage per each job assignment[,]" so they were "compensated by the job, and thus . . . paid on a 'piecework' basis." *Id.* at 1242. However, Judge Black opined that the time plaintiffs were forced to wait at the shop between jobs constituted "work" because they were not able to effectively use that time for their own purposes and it was to their employers' benefit to have "workers at their disposal when jobs ar[ose]." *Id.* (citation omitted). The court then denied summary judgment on the issue of whether the plaintiffs were exempt from the MWA because, based on how much time the plaintiffs were required to spend waiting at the dealership for jobs, "there [was] some evidence that Plaintiffs [were] either mixed-status employees or non-piecework employees." *Id.*

Following a bench trial, however, Judge Black confirmed that the plaintiffs *had* been paid on a piecework basis and were thus exempt from the protections of the MWA. *See Olivo v. Crawford Chevrolet, Inc. (Olivo II)*, No. CV 10-782 BB/LFG, 2012 WL 12897385 (D.N.M. Jan. 12, 2012). The court explained that one of the plaintiffs had been paid "by the job; i.e., he was paid per flat rate or 'flag rate' hour. For example, if the job was assigned for 15 flag hours, he would

be paid for no more or less than 15 hours . . ." regardless of how long it took him to complete the job. *Id.* at *1. "Thus, he was a pieceworker and not a salaried employee." *Id.* A second plaintiff had been compensated "by the job assignment, i.e., each paint job he performed had a certain number of hours allotted . . . and every pay period those hours would be added up and [the defendant] would pay him for those hours." *Id.* The court described both plaintiffs as being paid "every two weeks on a flag rate, piecework basis[,]" and found that they were required "to wait for work on Defendants' premises for between 10 and 20 hours each week without pay." *Id.* at *2. The court then concluded, as a matter of law, that the MWA "excludes 'employees compensated upon piecework, flat rate schedules or commission basis,' and thus [was] not applicable to Plaintiffs."[7] *Id.* at *3 (quoting N.M. Stat. Ann. § 50-4-21(C)(5)). Though he did not elaborate on the reasoning behind this conclusion, Judge Black clearly found that the 10–20 hours each week plaintiffs were required to remain on the shop premises and wait for work was *not* a sufficient departure from their piecework compensation structure to bring them back under the scope of the MWA as employees. *See id.*

The next year, in *Casias*, United States District Judge Martha Vázquez took up the issue of what constitutes piecework compensation in a case involving delivery drivers seeking overtime payments under the MWA. 2013 WL 12091857. In that case, defendant DMC operated a package pickup and delivery service much like FedEx. *Id.* at *1. DMC contracted with drivers to perform pickup and delivery services in exchange for compensation that was "fixed according to the routes they service[d]." *Id.* at *2. Drivers were paid "a flat rate for scheduled runs, 'specials,' and on-call

_____

[7] The court did find, however, that the defendant had violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, by not compensating the plaintiffs for the time they were required to wait for jobs at the auto body shop. 2012 WL 12897385, at *4–5. The FLSA does not exempt employees paid on a piecework basis from its wage or overtime protections, and only exempts employees who earn more than fifty percent of their compensation on a commission basis. *See* 29 U.S.C. § 207(i).

deliveries[,]" and the "most common compensation system for Plaintiffs involved negotiated rates for miles driven and stops made for each pick-up and delivery." *Id.* The plaintiffs argued that they were owed overtime under the MWA because significant portions of their days were spent in unproductive waiting time since DMC required them to conduct pickups and deliveries on their routes at specific times and would often delay their routes due to weather. *See id.* at *3. For example, one plaintiff's route was structured such that he was required "to make his last delivery in Tucumcari at Trigg Memorial Hospital at 11:35 a.m., and then wait three hours and 35 minutes, until 3:10 p.m. to make a pick-up at Trigg Memorial Hospital." *Id.* His "next 3:45 p.m. pick up at PMS Quay Country Health was five minutes away, thus requiring [him] to wait approximately 25 minutes between the two stops." *Id.*

Faced with DMC's summary judgment motion asserting that they were not employees under the MWA, the plaintiffs argued that "they actually were hourly workers because DMC altered the piecework compensation structure" by requiring them to "wait at customer sites, conduct extra-contractual pre-and post-delivery services, report to work and delivery sites at defined times, scan merchandise in front of customers, comply with DMC policies and procedures, and secure permission from DMC dispatch to leave a site or take a bathroom break." *Id.* at *5. Judge Vázquez explained that the common definition of piecework "is 'work done by the piece and paid at a set rate per unit.'" *Id.* (citing Merriam Webster's Collegiate Dictionary, 938 (2003 11th ed.)). Then, noting that the parties did "not dispute that Plaintiffs earned a predetermined fixed wage for each individual customer pick-up and delivery[,]" the court cited *Olivo* to "conclude[] that this fixed rate of payment constitutes a 'piecework' or 'flat rate' compensation structure within the meaning of Section 50-4-21(C)(5) of the Wage Act." *Id.* (citing *Olivo I*, 799 F. Supp. 2d at 1240–42).

The court went on, however, to assess whether there was a genuine dispute of fact as to whether "DMC altered the piecework compensation structure when it required Plaintiffs to engage in duties beyond delivering and picking up customer packages . . . render[ing] the Wage Act's exemption inapplicable." *Id.* Mirroring Judge Black's decision in *Olivo I* denying summary judgment, Judge Vázquez held that "[a]t this stage in the litigation, the Court must tip the scales in favor of Plaintiffs as the parties opposing summary judgment" and "Plaintiffs have pointed to evidence sufficient to create a factual question with respect to whether Defendant altered the piecework compensation structure and removed them from the Wage Act exemption." *Id.* at *6.

Setting aside for now the more complicated issue of what sufficiently *alters* a piecework compensation system to counteract the exemption, the courts' formulations of the basic definition of "piecework" in *Olivo* and *Casias* were clear—payments made "per unit" and tethered to a specific job or item, as opposed to payments tethered to hours spent working, qualified as piecework payments. *See* 799 F. Supp. 2d at 1240–42; 2013 WL 12091857 at *5. Indeed, this Court recently adopted that interpretation to hold that where the "[d]efendant paid the [plaintiffs] a set rate per unit of pipe laid, the . . . [compensation] meets the definition of piecework or flat rate pay pursuant to § 50-4-21(C)(5)." *Key v. Butch's Rat Hole & Anchor Serv., Inc.*, No. CIV 17-1171 RB/KRS, 2018 WL 4222392, at *3 (D.N.M. Sept. 5, 2018).

Just last year, however, United States District Judge James Browning undertook a thorough analysis of the term "piecework" and reached a different conclusion. *See Corman v. JWS of N.M., Inc.*, 356 F. Supp. 3d 1148, 1203 (D.N.M. 2018). In *Corman*, Judge Browning not only opined that *Olivo* was based on a flawed and insufficient analysis, but he also constructed novel, narrow definitions of the terms "commission," "flat rate," and "piecework" that have never been employed before in this District or by the Tenth Circuit. In *Corman*, the plaintiffs were truckdrivers who

worked for defendant JWS New Mexico—an oilfield services company involved in oil and gas production. *Id*. at 1154. "For each job that the Plaintiffs completed, regardless [of] how JWS New Mexico charged the customer, JWS New Mexico paid the Plaintiffs twenty-five percent of the customer's transportation charge." *Id.* at 1156. JWS charged customers in several different ways— sometimes based on bid rate estimates and sometimes by hourly rates—but the charges were not directly tied to the actual hours plaintiffs spent working. *See id.* at 1156–58. In addition to the 25% payment for completed jobs, plaintiffs were also paid by the hour for "yard time," which included time spent maintaining their trucks. *Id.* at 1158. When plaintiffs sued for overtime payments under the MWA, JWS moved for summary judgment "because the truck drivers fit the exception under the NMMWA for employees paid on a 'commission,' or alternatively, 'piecework' or 'flat rate' basis." *Id.* at 1160.

Judge Browning ultimately granted the defendant's motion for summary judgment, finding that JWS paid the plaintiffs on a commission basis since they worked irregular hours and were paid a proportional rate per sale that was decoupled from their actual hours worked. *Id.* at 1193– 1200. Then, although Judge Browning had already determined that the plaintiffs were exempt from the MWA due to their commission-based pay, the court still undertook an analysis of why their payment structure did *not* fall under the definitions of either "piecework" or "flat rate." *Id.* at 1200. After delving into dictionary definitions of "flat rate" and related caselaw, the court explained that flat rates are characterized by an unchanging rate charged to the *customer*, and "are fixed or unvarying, because the same rate applies to the same task, regardless [of] other factors." *Id.* at 1202–03. The court reasoned that the scenario in *Corman* was thus not a flat rate compensation system because the costs of similar oil services jobs fluctuated based on various factors like distance to the job, road conditions, and water costs, and were not "fixed or unvarying." *See id.*

Next, Judge Browning opined that *Corman* did not involve a "piecework" compensation system because "[t]he Court is persuaded that 'piecework' involves payment for production, disassociated from sales." *Id.* at 1204. To reach this conclusion, the court first listed various definitions of piecework including "'work done or paid for by the piece or job[,]' . . . 'work in which you are paid for each thing you make or do and not for the amount of time you work[,]'" and "work for which the amount of pay depends on the number of items completed rather than the time spent making them." *Id.* at 1203 (quoting Black's Law Dictionary (10th ed. 2014); Merriam-Webster Online Dictionary, http://www.merriamwebster.com/dictionary/piecework; Cambridge Dictionary, http://dictionary.cambridge.org/us/dictionary/english/piecework).

The court then cited a Seventh Circuit case interpreting the FLSA, *Alvarado v. Corporate Cleaning Services, Inc.*, to support the idea that piecework compensation relates only to the *production* of goods, not sales. *Id.* (noting that a piecework payment scheme exists when "the scarf worker is paid for making scarves even if they haven't been sold—that is, even if he's producing for inventory" whereas a commission compensation system exists when "the shoe salesman is paid only when he makes a sale") (quoting *Alvarado*, 782 F.3d 365, 367 (7th Cir. 2015)). The Seventh Circuit held that window washers were paid on a commission basis rather than a piecework basis because they "are paid only if there's been a sale, namely a sale of window-washing service to a building owner or manager." *Alvarado*, 782 F.3d at 367. Though Judge Black held in *Olivo* that plaintiffs who were paid per vehicle repair job were paid on a piecework basis, Judge Browning discounted this holding as "carr[ying] limited persuasive value" because "Judge Black reaches this designation without much explanation." *Corman*, 356 F. Supp. 3d at 1204. Thus, Judge Browning opined, "the NMMWA [piecework] exemption applies where employers tie employees' compensation to work done, disconnected from hours worked and sales to consumers." *Id.*

The Court appreciates Judge Browning's thorough analysis of each term in the MWA exemption provision but declines to adopt a similarly narrow interpretation of the term "piecework" here. Instead, as it has before, *see Butch's Rat Hole*, 2018 WL 4222392, at *3, the Court will follow the common-sense approach laid out in *Olivo* and *Casias* to find that FedEx compensated Ms. Armijo on a piecework basis. For one thing, it is not immediately clear to the Court that, as Judge Browning suggests, "everyday parlance" associates piecework only with production for the sake of production. *See Corman*, 356 F. Supp. 3d at 1204. Beyond the Seventh Circuit's opinion distinguishing scarf-makers and window-washers and finding the latter to be paid on a commission rather than a piecework basis, *see Alvarado*, 782 F.3d at 367, the Court finds no persuasive law suggesting that if a worker is paid per item produced or per service job completed, that payment scheme is not considered piecework if a customer paid for the item or ordered the job prior to its completion. Garment production operations where workers are paid by the item of clothing produced are certainly accurate and classic examples of piecework compensation. *See Corman*, 356 F. Supp. 3d at 1203 (citing *United States v. Rosenwasser*, 323 U.S. 360, 364 (1945)). This example does not, however, necessarily foreclose other payment schemes (i.e., those that compensate workers per item or per job) from also being defined as piecework compensation merely because the work was initiated by a sale or a customer-related job.

For example, in *Dole v. Snell*, the Tenth Circuit held that individuals who were paid to decorate cakes *as customer orders came in to the shop* were "paid on a piecework basis, by the cake." 875 F.2d 802, 803–04, 809 (10th Cir. 1989). So, even though cake production was tied to customer orders, the compensation scheme involved piecework. *See id.* Judge Browning cites *Dole* as an example supporting the "production only" conception of piecework since plaintiffs were paid "by the cake," *Corman*, 356 F. Supp. at 1203, but fails to address the fact that the cakes were

decorated in response to customer orders. Similarly, in *Tapia v. DIRECTV, Inc.*, No. CV 14-939 JCH/GBW, 2016 WL 9777179, at *2 (D.N.M. June 22, 2016) the court held—though it was not a disputed issue—that "Plaintiffs were paid pursuant to the piece-rate payment scheme utilized throughout DIRECTV's network" for installing satellite connections. *Id.* "Under this system, Plaintiffs were not paid for all hours they worked for Defendants, but were paid on a per-task basis for satisfactorily completing a DIRECTV-approved satellite installation. The piece-rate system pays technicians only for certain enumerated 'productive' tasks." *Id.*

Thus, the Court finds it unnecessary to distinguish between the "per task or job" conception of piecework endorsed in *Olivo*, *Casias*, *Butch's Rat Hole*, *Dole,* and *Tapia* and the "per item produced" conception of piecework contemplated in *Corman* and the narrower cases it cites. Both "per job" payments and "per item" payments are logical examples of piecework compensation systems because the completion of a discrete task (whether it be painting a car or sewing a scarf) is the unit upon which the worker's pay is calculated. Ms. Armijo was paid a specifically calculated rate per package picked up, per package delivered, per stop made on her route, and per excess mile driven in a given day. (*See* Docs. 102-1 at 6 ¶ 10, 8 ¶ 18; 104 at 5 ¶ 2; 63-1 at 3–32.)

Certain provisions in the OA indeed prescribe higher rates of payment for special types of deliveries like flexed packages, and additional payments for high density routes and fluctuating fuel costs. (*See* Doc. 63-1 at 3–32.) Yet these various addenda to the OA all seem to affect not the *method* of compensation, but the *rate* of compensation for each completed unit. Ms. Armijo received a base payment per package, stop, and mile, but that price might increase if she made a certain number of stops in a high-density area, picked up or delivered "premium" packages or late scheduled deliveries, or expended additional fuel driving to and from the FedEx terminal. (*See id.*) Thus, though the OA's various provisions caused the calculated rate of compensation per unit to

potentially fluctuate from week to week or from package to package, those payments were still made on a piecework basis because they were tethered to the completion of a discrete task, not the number of hours each week Ms. Armijo spent working. It is clear to the Court that Ms. Armijo's "work [was] done or paid for by the piece or job." *See* Black's Law Dictionary (11th ed. 2019).

Further, unlike in the FLSA context where commission pay is exempt from overtime protections while piecework pay is not, *see* 29 U.S.C. § 207, making meticulous distinctions between the terms "piecework," "flat rate," and "commission" is largely unnecessary to determine whether the MWA exception applies. Here, a finding that Ms. Armijo was not compensated on a piecework basis would leave open the possibility that she was compensated on a commission or flat rate basis and thus still exempt from the MWA. *See Corman*, 356 F. Supp. at 1204; *Alvarado*, 782 F.3d at 367. The Court will not muddy its holding by undertaking a full analysis of the terms "flat rate" and "commission," but simply points out the obvious—the weekly payments FedEx made to Jaimes Elegant were not based on hours worked. And Ms. Armijo has presented no argument as to how they *should* be classified beyond her broad assertion that the piecework exemption does not apply and "[d]rivers were paid on a mixed-status basis." (*See* Doc. 104 at 10.) That customers at the front end of the process first paid FedEx to pick up and deliver their packages does not, in the Court's view, remove this compensation scheme from the definition of piecework.[8]

---

[8] Ms. Armijo argues that FedEx "waived its argument that *Corman* is wrongly decided" by failing to address it in its opening brief. (Doc. 109 at 1–2.) However, the Tenth Circuit "make[s] an exception when the new issue argued in the reply brief is offered in response to an argument raised in the [response] brief," as is the case here. *See Beaudry v. Corrs. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003). While FedEx's failure to initially address the inconsistency between *Corman* and the cases it relies on in its motion for summary judgment is perhaps disingenuous, Ms. Armijo's "waiver" argument is incorrect and the Court would have been required to address *Corman's* "intra-district conflict with other New Mexico cases" either way. (*See* Doc. 109 at 2.)

### B. Ms. Armijo's affirmative duties and alleged unproductive waiting time are not sufficient to alter the piecework payment structure.

The inquiry does not end here, however, as the Court will now follow the lead of *Olivo*, *Casias*, *Butch's Rat Hole*, and *Corman* to determine whether the specific facts surrounding how FedEx compensated and managed Ms. Armijo sufficiently alters the piecework compensation structure to render the MWA exemption inapplicable. The relevant caselaw on this issue falls into two camps of plaintiff arguments. In *Olivo* and *Casias*, the plaintiffs argued that *unpaid*, unproductive waiting time was essentially time that should have been compensated by the hour and was significant enough that the plaintiffs were not true piecework employees. *See Olivo I*, 799 F. Supp. 2d at 1242; *Casias*, 2013 WL 12091857, at *5. In *Butch's Rat Hole* and *Corman*, on the other hand, the plaintiffs argued that because at least some percentage of their pay was actually comprised of hourly wages, they were not true piecework employees. *See* 2018 WL 4222392, at *3; 356 F. Supp. 3d at 1205. Most of these cases involved only preliminary decisions at the summary judgment stage, but they provide helpful markers for the Court by determining whether the non-piecework tasks and duties in each case (paid or unpaid) were significant enough to call the plaintiff's piecework status into question.

In *Olivo*, as described previously, the court initially found that where the plaintiffs were paid on a piecework basis per car repaired but were required to wait at the auto body shop for approximately 15 hours per week waiting for jobs, "there [was] some evidence that Plaintiffs [were] either mixed-status employees or non-piecework employees." *Olivo I*, 799 F. Supp. 2d at 1242. Judge Black then made a finding of fact, following a bench trial, that "Defendants required Plaintiffs to wait for work on Defendants' premises for between 10 and 20 hours each week without pay." *Olivo II*, 2012 WL 12897385, at *2 ¶ 21. The court went on to conclude, as a matter of law, that "[t]he [MWA] excludes 'employees compensated upon piecework, flat rate schedules or

commission basis,' NMSA 1978 § 50-4-21(C)(5) (2008), and thus is not applicable to Plaintiffs."

*Id.* at *3 ¶ 3. Thus, while Judge Black did not elaborate in his findings of fact and conclusions of

law as to why he ultimately determined that the 10–20 hours of waiting time per week did *not*

affect plaintiffs' piecework status, this case serves as the only example of a court moving beyond

the summary judgment stage to decide whether the exemption indeed applied.

In *Casias*, Judge Vázquez held that delivery truck drivers were paid on a piecework basis

when they "earned a predetermined fixed wage for each individual customer pick-up and

delivery[,]" but went on to assess whether the defendant "altered the piecework compensation

structure when it required Plaintiffs to engage in duties beyond delivering and picking up customer

packages." 2013 WL 12091857, at *5. The court held that the "[p]laintiffs [had] pointed to

evidence sufficient[,] . . ." at the summary judgment stage, "to create a factual question with respect

to whether Defendant altered the piecework compensation structure and removed them from the

Wage Act exemption." *Id.* at *6. Specifically, the court emphasized evidence that plaintiffs were

required:

> [(i)] to spend an average of in excess of twenty hours per week waiting between
> scheduled deliveries[;] . . . (ii) to wait for customers to prepare their delivery items
> even if it was well beyond the pick-up time[;] (iii) to wait for scheduled deliveries
> instead of leaving early to avoid snow storms despite the fact that individual
> customers agreed to release Plaintiffs early[;] and [(iv)] to wait at the DMC facility
> for three to four hours while DMC tracked road conditions and decided whether
> drivers should undertake their routes. Plaintiffs' evidence further indicate[d] that
> while Plaintiffs were waiting up to three or four hours before they undertook their
> next run, Plaintiffs and their drivers were required to remain at the pick-up or
> delivery site.

*Id.* The court had already "concluded that Plaintiffs were paid on a piecework basis because their

compensation was fixed according to the routes they serviced," but the evidence that DMC

"compelled them to spend in excess of twenty hours per week waiting at customer pick-up and

delivery locations changes the piecework payment structure." *Id.* (citing *Olivo*, 799 F. Supp. 2d at

19

1242). "Thus, because this waiting time between scheduled runs was for the benefit of DMC, there remains a material question of fact as to whether Plaintiffs were 'piecework' employees under the Wage Act precluded from recovering under the statute." *Id.* (citing *Olivo*, 799 F. Supp. 2d at 1242).

Though this dispute of fact was enough to preclude summary judgment in *Casias*, the court rejected the plaintiffs' secondary argument that DMC had also "altered the existing piecework scheme by requiring Plaintiffs to undertake various affirmative duties . . . ." *Id.* at *8. These affirmative duties included requirements that drivers "report[] to work and arriv[e] at delivery sites at defined times, scan[] merchandise in front of customers, . . . and conduct[] extra-contractual pre-and post-delivery duties at the DMC warehouse." *Id.* The plaintiffs also argued that DMC altered the piecework payment structure by requiring them to "abid[e] by company policies in making deliveries and pick-ups (including carrying a certain amount and type of insurance, maintaining a cell phone for communication with DMC, and not allowing persons or animals in the vehicle while making deliveries) . . . ." *Id.*

Judge Vázquez disagreed, holding that "the affirmative duties Plaintiffs identify are integral to the delivery and pick-up process itself and . . . Plaintiffs were compensated for completing these duties through the piecework compensation structure." *Id.* (citing *In re Thompson Bros., Inc. et al.*, No. 92-32, 1993 WL 832137, at *2 (B.S.C.A. Jan. 29, 1993) ("assuming without deciding that operators charged with delivering mail were paid on a piece rate (per-mile driven) basis despite the fact that operators spent approximately 30 minutes loading the mail")). Thus, the court found that affirmative duties like abiding by various company policies, reporting to work at a certain time, arriving at delivery sites at certain times, and conducting pre- and post-delivery activities at the warehouse did "not alter the piecework payment system or otherwise convert Plaintiffs into hourly employees." *Id.* In other words, a requirement that drivers spend upwards of

20 hours each week simply waiting around for deliveries and pickups might be enough to alter the piecework payment structure, but mandatory warehouse loading and unloading time and other affirmative duties related to the job did not.

Next, *Corman* and *Butch's Rat Hole* shed some light on what percentages of hourly pay might convert a worker paid predominantly on a piecework basis into a non-piecework employee. In *Corman*, after determining that the oilfield workers had been paid on a commission basis and were thus exempt from the MWA's protections, Judge Browning went on to hold that the plaintiffs' "yard time"—time spent doing truck maintenance for which they were paid hourly wages—was not sufficient to alter their commission-based pay structure because "[t]he yard time compr[]ises a de minimis amount of the Plaintiffs' pay." *Corman*, 356 F. Supp. 3d at 1205. The court explained that in a given year, "only two percent of [plaintiffs'] compensation came from yard time." *Id.* Thus, while the MWA exemption provision is "silent on how much an employee must receive in commissions to qualify for the exemption" and caselaw similarly provides little guidance, "[p]ure common sense dictates that the statute should not mean that employees regularly paid on a commission, flat rate, or piecework basis[] should be removed from the exemption[] because they receive de minimis hourly amounts for tangential tasks." *Id.* at 1205, 1207.

Finally, in *Butch's Rat Hole*, the plaintiffs were paid through a combination of piecework compensation for laying pipe and hourly payments that kicked in if and when the job exceeded estimated bid hours. 2018 WL 4222392, at *1–3. The plaintiffs argued similarly that this mixed-pay structure meant they were not excluded from MWA protections by the piecework exception. *Id.* at *3. The defendant "urge[d] the Court to rely on *Corman* to find that the hourly pay Plaintiffs received in this case was de minimis and, therefore, the MWA's overtime provision is inapplicable." *Id.* at *4. In denying the defendant's motion for summary judgment, this Court held

that "[t]he undisputed facts . . . demonstrate that Plaintiffs received hourly pay for 15–22% of their total salary, a much higher number than the 2% in *Corman*." *Id.* The Court explained that the plaintiffs "ha[d] come forward with evidence sufficient to create a genuine dispute of fact with respect to whether [they] are truly exempt from the MWA[,]" because if unproductive waiting time occurred *after* bid hours had expired, the plaintiffs were compensated at an hourly pay rate which ultimately comprised up to 22% of their total salary. *Id.* at *4–5.

Turning to the facts that Ms. Armijo has brought forward to assert that she was paid on a "mixed-status basis" (*see* Doc. 104 at 10), the Court finds that they are not sufficient to alter her piecework payment status or even create a genuine dispute of fact as to that status, and thus Ms. Armijo is exempt from the protections of the MWA. Ms. Armijo points to four ways in which she alleges FedEx altered the payment structure, the first being quarterly, "mandatory group meetings with the FedEx terminal manager and other FedEx personnel." (*Id.* at 3 ¶ 3.) She asserts that these meetings "took place early morning at the terminal[,]" and "typically lasted between 30 to 60 minutes." (Doc. 104-1 at 1–2.) By Ms. Armijo's own calculations, the time spent at these mandatory meetings would add up to, at most, approximately 4 hours *per year*. (*See id.*) The Court is not convinced that these required meetings alter the piecework payment structure and finds that, like in *Casias*, they represent "affirmative duties . . . integral to the delivery and pick-up process itself." 2013 WL 12091857, at *8 (citation omitted).

Second, Ms. Armijo states that each morning, "fully-loaded drivers" were prevented "from leaving the FedEx terminal to begin their daily deliveries." (Doc. 104 at 3 ¶ 3.) She alleges that she was "required to arrive at the terminal in the morning at about 7 a.m.," and even when she had finished loading her truck and was ready to leave, she "was told by FedEx personnel that [she] could not leave until . . . all packages that had been delivered to the terminal the day before were

unpacked, sorted, and loaded for delivery with all the drivers." (Doc. 104-1 at 2.) Ms. Armijo estimates that she generally "waited 30 minutes every day to be released from the terminal." (*Id.*) Viewing the facts in the light most favorable to Ms. Armijo by assuming these waiting periods were completely unproductive and that she worked seven days per week, Ms. Armijo was required to spend approximately 3.5 unproductive hours per week waiting to depart the terminal.

Third, Ms. Armijo argues that FedEx altered the piecework payment structure by "assigning drivers 'windows' or designated time slots in which a delivery or drop [was] required; drivers may not pick-up or deliver outside the assigned 'window.'" (Doc. 104 at 3–4 ¶ 3.) Ms. Armijo asserts that she "was probably assigned 10 special drop-offs or pickups a week[,]" was required to fulfill the task during the assigned time-window[,]" and that "[i]t was not unusual for [her] to arrive at the assigned location early, in which case [she] had to wait for the beginning of the assigned time window." (Doc. 104-1 at 2–3.) Even setting aside the fact that Ms. Armijo testified that with at least one customer she was able to work out an arrangement to tweak the window and avoid unnecessary wait times (*see* Docs. 102-1 at 7 ¶ 14; 102-2 at 186:17–187:16), Ms. Armijo does not provide an estimate of how much time she actually spent unproductively waiting for work due to these windows.

In *Casias*, the court found a possible altering of the piecework pay structure when the plaintiff drivers alleged they were being forced to wait "in excess of twenty hours per week" between scheduled deliveries due to route design, stringent pickup and delivery windows, and the requirement that they wait for customers to finish packaging items. 2013 WL 12091857, at *6. The plaintiffs in *Casias* had also produced examples of daily route schedules and the specific inefficient delivery and pickup windows that led to long unproductive wait times. *See id.* at *2. Ms. Armijo, on the other hand, has not indicated how much time per week she was forced to wait

due to the mandated pickup and delivery windows, but describes vaguely that "it was not unusual" for her to arrive early and have to wait. (Doc. 104-1 at 2–3.) Without evidence that such waiting time was significant, these requirements again appear more akin to the affirmative duties the *Casias* court described as integral to the piecework tasks, like the requirements that drivers "report[] to work and arriv[e] at delivery sites at defined times" and abide by company policies. 2013 WL 12091857, at *8.

Fourth, Ms. Armijo asserts that FedEx altered the piecework compensation scheme by requiring "drivers who ha[d] returned to the terminal at the end of their day to complete various administrative and manual services." (Doc. 104 at 4 ¶ 3.) After arriving at the terminal, Ms. Armijo "was required to complete FedEx paperwork, oversee the routing of any packages that [she] had picked up during the day, [and] perform maintenance and conduct inspections on the vehicle." (Doc. 104-1 at 3.) She estimates that this work consumed approximately 30 minutes each day. (*See id.*) Again, the Court finds that these duties appear—even by Ms. Armijo's own description of the work—to be a necessary aspect of running a pickup and delivery operation and integral to that work for which she was compensated on a piecework basis. Without unloading and tracking packages and ensuring her vehicle was operational, Ms. Armijo could not complete her duties as a pickup and delivery driver. *See Casias*, 2013 WL 12091857, at *8 (citation omitted). Unlike the time workers spent waiting to work in *Olivo* and *Casias*, this post-route administrative work and vehicle maintenance does not appear to be unproductive waiting time. Still, because the *Corman* court considered whether plaintiffs' "yard time" conducting truck maintenance was enough to alter their payment status, the Court will construe these facts in a light most favorable to Ms. Armijo and include her estimated 3.5 hours per week spent conducting post-route administrative tasks in the analysis of how much time Ms. Armijo spent doing hourly work.

Thus, Ms. Armijo has asserted that she spent, at most, an estimated total of seven hours each week engaging in activities that she alleges were not compensated on a piecework basis and make her a mixed-status employee—30 minutes each day waiting to leave the terminal with a fully-loaded truck and 30 minutes each day completing various post-route administrative tasks. In the cases that looked at mandatory unproductive, unpaid waiting time as an indicator of whether an individual was truly a piecework employee, Judge Black found in *Olivo* that even 10–20 hours per week of such unproductive waiting time did not avoid the MWA exemption. *See Olivo II*, 2012 WL 12897385, at *2 ¶ 21, *3 ¶ 3. In *Casias*, Judge Vázquez held that "*in excess* of twenty hours" spent unproductively waiting raised an issue of fact regarding pay status, but she did not consider mandatory unloading and loading activities to be part of that 20-hour total. *See* 2013 WL 12091857, at *8. Here, the Court finds that a maximum of 7 hours each week spent in a combination of unproductive waiting time and integral but not explicitly compensated post-delivery administrative activities is simply not enough to raise a material issue for trial regarding Ms. Armijo's compensation status, particularly as this calculation takes into account Ms. Armijo's own time estimations and assumes, in her favor, that she worked all seven days per week. Even accepting Ms. Armijo's statement of the facts in this case, the vast majority of her work was still compensated on a piecework basis, and thus the Court finds that she was still "unmistakably" paid on a piecework basis. *Id.* at *5 (citation omitted).

The holdings in *Corman* and *Butch's Rat Hole* support this conclusion as well. It is concededly slightly harder to compare Ms. Armijo's claims to the facts in those cases because the *Corman* and *Butch's Rat Hole* plaintiffs actually *were* paid by the hour for certain tasks, so the courts could compare their total hourly income to total piecework or commission income to determine whether the hourly pay was de minimis. Still, assuming the current New Mexico

minimum wage of $7.50 per hour, *see* N.M. Stat. Ann. § 50-4-22(A), Ms. Armijo would have earned $52.50 per week for the time she alleges she was not compensated on a piecework basis. During her deposition, Ms. Armijo discussed one example of a weekly settlement payment to Jaimes Elegant which totaled $2,277.93. (*See* Doc. 102-2 at 288:1–6.) Construing these earnings conservatively so as to favor Ms. Armijo, the Court will assume an average weekly settlement of $2,000. Even then, the $52.50 in hourly wages would only comprise 2.63% of Ms. Armijo's wages.

Thus, much like in *Corman* where the plaintiffs' hourly earnings for "yard time" were de minimis because they comprised only 2% of their total salary, here the time Ms. Armijo alleges she was not compensated on a piecework basis is similarly de minimis and does not alter the fact that the vast majority of her earnings accrued through piecework payments. *See* 356 F. Supp. 3d at 1205. Unlike the hourly wages that comprised 15–22% of the plaintiffs' total compensation in *Butch's Rat Hole*, Ms. Armijo's time spent in FedEx quarterly meetings, waiting to depart the terminal each morning, and completing administrative tasks at the end of the day simply does not suggest anywhere near a significant enough departure from her otherwise piecework compensation structure to create a material issue of fact for trial. *See* 2018 WL 4222392, at *4–5.

The Court is sympathetic to the fact that Ms. Armijo worked long hours as a FedEx driver and that many courts across the country have found FedEx drivers in similar situations to be "employees" as a matter of law. (*See* Compl. at 1–2.) New Mexico, however, has a uniquely broad statutory exemption in the MWA that excludes all workers who earn their income on a piecework basis from state overtime protections. Rather than simply mirroring the FLSA's exemption for commission pay, "[t]he New Mexico Legislature instead chose to enact an exemption broader than the FLSA's" when it chose to exempt workers compensated under commission, flat rate, *and* piecework structures from the MWA. *Corman*, 356 F. Supp. 3d at 1207.

States in which FedEx drivers have successfully proved their "employee" status in similar cases lack broad exemption language like New Mexico's in their state minimum wage and overtime laws. For example, in *Slayman v. FedEx Ground Package System, Inc.*, where the Ninth Circuit held that drivers were "employees under Oregon's economic-realities test[,]" 765 F.3d 1033, 1047 (9th Cir. 2014), Oregon's overtime laws and regulations did not exempt employees paid on a piecework basis, *see* Or. Rev. Stat. § 653.010, but rather laid out specific methods for how to calculate overtime payments owed for piecework compensation. *See* Or. Admin. R. 839-020-003(3)(b). In *Alexander v. FedEx Ground Package System, Inc.*, the Ninth Circuit similarly held that FedEx drivers were "employees as a matter of law under California's right-to-control test." 765 F.3d 981, 997 (9th Cir. 2014). However, the California Labor Code does not exempt employees paid by piecework, flat rate, or commission schemes from its overtime protections. *See* Cal. Lab. Code §§ 500–558.1. *Accord Craig v. FedEx Ground Package Sys., Inc.*, 335 P.3d 66, 74, 92 (Kan. 2014) ("FedEx delivery drivers are employees for purposes of the [Kansas Wage Payment Act (KWPA)]," and "[n]otably, the KWPA does not contain any express provision relating to the payment of overtime, which is typically pursued under a FLSA claim" (discussing Kan. Stat. Ann. § 44–313 *et seq.*)).

Some states do have robust exemptions in their overtime and minimum wage laws. *See, e.g.*, Alaska Stat. Ann. §§ 23.10.055–60 (excluding a long list of specific professions, such as individuals employed "in the capacity of an outside salesman or a salesman working on a straight commission basis[,] . . ." as well as those employed as "flat-rate mechanic[s]" and "employee[s] engaged in agriculture."). Even Alaska, however, does not broadly exclude any and all employees who are compensated on a piecework, flat rate, or commission basis. New Mexico appears to stand alone in this regard.

While MWA exemptions must be "strictly and narrowly construed against employers[,]" *Casias*, 2013 WL 12091857, at *5 (citations omitted), the New Mexico Legislature clearly intended to exempt piecework employees from its protections, and the Court finds that FedEx has met its burden to show that Ms. Armijo is "unmistakably" such an employee. The specific facts Ms. Armijo has designated to rebut the motion for summary judgment fail to show that there is a "genuine issue for trial" regarding her pay status. *See Celotex*, 477 U.S. at 324. Ms. Armijo received her compensation from FedEx in the form of piecework payments, despite the de minimis time she spent each week completing non-piecework tasks. Individuals "compensated upon [a] piecework . . . basis" are not considered "employees" under the MWA. *See* N.M. Stat. Ann. § 50-4-21(C)(5). Thus, Ms. Armijo's remaining claim fails as a matter of law.

## III.    Motion to Certify Class

When a case is brought as a class action and the named plaintiff's claims are dismissed, "[t]he case is therefore moot unless it was duly certified as a class action pursuant to [Federal Rule of Civil Procedure] 23 . . . ." *Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (citation omitted); *cf. Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1138 (10th Cir. 2009) ("[B]ecause a certified class becomes an independent juridical entity capable of satisfying the standing requirements of Article III, the mooting of a named plaintiff's claims *after* class certification does not moot the claims of the class.") (citing *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 755–56 (1976); *Sosna v. Iowa,* 419 U.S. 393, 399 (1975)).

The Supreme Court has recognized two situations, however, "in which a class may be certified despite the mooting of the named plaintiff's claim *prior* to the district court's certification decision . . . ." *Clark*, 590 F.3d at 1139. First, "when the plaintiff's claim is 'capable of repetition, yet evading review,'" and second, "when the plaintiff's claim is 'inherently transitory [such] that

the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'" *Id.* (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398–400 (1980) (internal quotations omitted)). Also, in the Tenth Circuit, a "federal court's Article III jurisdiction to hear [a] motion for class certification is not extinguished by the Rule 68 offer of judgment to an individual plaintiff." *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1249 (10th Cir. 2011) (citations omitted).

None of these scenarios are applicable to this case, where the Court has concluded that a statutory exception to the state law under which the named plaintiff brings her sole claim prevents her from seeking relief under that statute as a matter of law. Further, ruling on Ms. Armijo's motion for class certification prior to FedEx's motion for summary judgment would still have required an analysis of the MWA piecework exception and its applicability to Ms. Armijo and the putative class. (*See* Doc. 91 at 39 (FedEx asserting that "[i]f Armijo argues and raises purported facts outside the OAs as the plaintiffs did in *Casias I*, in an attempt to defeat the piecework exemption, such analysis would require individualized inquiries").)

As this Opinion illustrates, the inquiry into whether the requirements FedEx imposed on drivers removed Ms. Armijo from the piecework exemption involved the analysis of various facts specific to her experience. (*See* pages 22–26, *supra*.) To the extent that members of the putative class allege that similar facts would remove them from the exemption (i.e., mandatory quarterly meetings, unproductive waiting time before work, post-delivery activities, and set delivery windows), then the Court's conclusion that Ms. Armijo is not an employee as a matter of law would likely apply to all members of the proposed class. On the other hand, should other members of Ms. Armijo's proposed class argue that different facts remove them from the exemption, such

an analysis of each class member's employment status would require individualized inquiries not suitable for class certification.

**THEREFORE,**

**IT IS ORDERED** that Defendant FedEx Ground Package System, Inc.'s Motion for Summary Judgment (Docs. 102) is **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Jaime Loree Armijo's Opposed Renewed Motion for Class Certification (Doc. 87) is **DENIED as moot.**

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**